**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------ x
Accenture LLP                                                    :
                                                                :
                                        *Petitioner*,           :       Case No. 1:19-cv-7888
                                                                :
                    v.                                          :
                                                                :
                                                                :
Nadine El-Etr Moore,                                            :
                                                                :
                                        *Respondent.*           :
                                                                :
                                                                :
                                                                :
------------------------------------------------------------------ x

## PETITION FOR PRELIMINARY INJUNCTION IN AID OF ARBITRATION

Petitioner Accenture LLP ("Accenture," the "Company" or "Petitioner"), by its

undersigned attorneys, Winston & Strawn LLP, petitions this Court for an Order pursuant to Rule

65 of the Federal Rules of Civil Procedure that issues a preliminary injunction in aid of arbitration[1]

as follows:

## NATURE OF THE ACTION

1.      Accenture brings this action for injunctive relief pending arbitration against Nadine

El-Etr Moore ("Moore" or "Respondent"), who, until August 2, 2019 was a highly-paid senior

executive and Leader of Accenture's Finance & Risk practice for the Midwest.  After spending

---

[1] Accenture and Moore are party to an arbitration agreement contained within the December 1,
2017 U.S. Standard Managing Director Employment Agreement (LLP) that Moore executed in
connection with her promotion to Managing Director at Accenture (the "Employment
Agreement").  *See* Ex. 1, ¶ 13 (Employment Ag.).  The arbitration agreement expressly authorizes
Accenture to seek the preliminary injunctive relief requested herein in aid of arbitration.  Accenture
is in the process of initiating arbitration pursuant to the Parties arbitration agreement.  *See* Ex. 1, ¶
13(e).

almost four (4) years learning Accenture's unique and highly-confidential client strategies and solutions, and receiving over a million of dollars in compensation along the way, Moore abruptly resigned to join Boston Consulting Group ("BCG") in the very same capacity and in the very same territory as the position she held at Accenture.  Moore's work for BCG in the same capacity and territory is an imminent threat to Accenture's confidential information and trade secrets, and is a direct and willful violation of the narrowly-tailored non-competition restriction and threatened the imminent violation of the non-disclosure restriction contained in her December 1, 2017 Employment Agreement with Accenture.  Moore agreed to these restrictions in her Employment Agreement in exchange for a promotion to Managing Director and an increase in base compensation (to over $300,000 annually) and substantial increase in compensation opportunity.  Having collected her substantial compensation from Accenture, she now seeks to leverage Accenture's confidential information and trade secrets to improperly and unjustly enrich herself and BCG, at Accenture's expense.

2.      Moore could easily have continued her consulting career outside of Accenture, including at BCG.  The narrow non-competition restriction in her Employment Agreement prohibits Moore only from (i) performing services for a competitor that are similar to those she provided at Accenture, (ii) in the same Midwest territory for which she was responsible at Accenture, for one year following her resignation.  In other words, Moore could have worked for BCG immediately in many different capacities, or in the same capacity she had at Accenture but outside of the Midwest Territory—which would not have been difficult given BCG's international footprint and wide range of consulting services.  Instead, Moore willfully eschewed her obligations to Accenture and has started working at BCG in direct violation of the non-competition restriction to which she agreed.

2

3.     Moore's wrongful conduct not only breaches the clear language of her non-competition restriction, it also threatens the unique and highly confidential client strategies and solutions Accenture shared with Moore and which Moore helped to develop for Accenture.   In her similar work for BCG in the same Midwest territory, Moore inevitably will rely on her deep knowledge of Accenture's confidential information and trade secrets in developing strategies and solutions for BCG to market to its clients and in servicing its clients.  Accenture has devoted substantial time and resources, and many millions of dollars, to develop the highly-confidential client strategies and solutions provided to Moore, including through acquisitions and significant investments in resources, personnel and technology.  Given the almost complete overlap between her Accenture work and what is, upon information and belief, her expected work at BCG, Moore cannot help but unlawfully leverage Accenture's confidential information and trade secrets to will unfairly improve BCG's position in the market and in competition with Accenture itself.

4.     In order to prevent Moore from inevitably using Accenture's confidential information and trade secrets for the benefit of BCG, Moore must be held to the reasonable and necessary non-competition and non-disclosure obligations to which she willingly and voluntarily agreed.

5.     By this action, Accenture respectfully requests that this Court enter a preliminary injunction in aid of arbitration prohibiting Moore from performing services for BCG in the Midwest region that are the same or similar to those that she previously performed at Accenture and are in violation of her Employment Agreement.

## PARTIES

6.      Petitioner, Accenture LLP, is a limited liability partnership.  Accenture LLP is a global strategy, consulting, technology, and operations company that helps its clients improve their business and get ahead in the digital economy.  Accenture LLP has three partners: (i) Accenture Inc., (ii) Accenture Sub II Inc., and (iii) Accenture LLC.  Each of Accenture Inc. and Accenture Sub II Inc. is incorporated under the laws of Delaware and has its principal place of business in Delaware.  Accenture LLC has one member, Accenture Sub LLC.  Accenture Sub LLC also has one member, Accenture Inc.

7.      Respondent, Nadine El-Etr Moore, is a citizen and resident of the State of Illinois. She resides, upon information and belief, at 641 W. Willow Street, Unit 122, Chicago, Illinois 60614.  Moore is a former Managing Director in Accenture's Finance & Risk Services group and was based in the Company's Chicago, Illinois office.  Upon information and belief, Moore is currently a Partner and Managing Director in BCG's Financial Services group and is based in BCG's Chicago, Illinois office.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because this is an action between the citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9.      This Court has personal jurisdiction over Moore based on § 13(g)(2) of the Employment Agreement.  *See* Ex. 1.  Under § 13(g)(2) of the Employment Agreement, Moore agreed to exclusive jurisdiction in the state and federal courts of New York for any lawsuit seeking preliminary relief in aid of an arbitration, including without limitation, preliminary relief to restrain Moore from committing any breach, or continuing to commit any breach, of the restrictive covenants in the Employment Agreement.

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a)(3) under the forum selection clause, or § 13(g)(2), in the Employment Agreement. Section 13(g)(2) designated the state and federal courts of New York as the exclusive venues for any lawsuit seeking preliminary relief in aid of an arbitration, including without limitation, preliminary relief to restrain Moore from committing any breach, or continuing to commit any breach, of the restrictive covenants in the Employment Agreement.

11.     Under § 13(g)(1) of the Employment Agreement, the parties also "acknowledge[d] that the forum designated … has a reasonable relation to this Agreement, and to the parties' relationship with one another."

## GENERAL ALLEGATIONS

### I.     Accenture's Business

12.     Accenture is a global consulting, IT, and management outsourcing company that helps its clients improve their business procedures and performance.  It aims to help its clients innovate, transform, and grow their businesses.

13.      Moore was part of Accenture's Financial Services ("FS") group.  Accenture's FS group generally focuses on the development of industry-specific solutions for high and mid-tier companies in the capital markets, banking and insurance industries.  The FS group combines Accenture's capabilities across management consulting, strategy, technology, and business process outsourcing—together with Accenture's industry and functional expertise and specialized software and assets—to provide highly differentiated, end-to-end services for clients.

14.     Within the FS group is the Financial & Risk Services ("F&R") practice.  Moore served as the Leader of the F&R practice for Accenture in the Midwest region.[2]  The F&R practice assists financial services firms and insurance companies with defining and implementing digital corporate solutions, managing profitability and expenses, simplifying operations, and addressing regulations.  The F&R practice also provides strategies and solutions to various types of risks that clients face, such as credit risk, financial risk and operational risks, including cybersecurity and fraud.

15.     The strategies and solutions developed and offered by Accenture, and the technologies that Accenture deploys to implement those strategies and solutions, are among Accenture's most critical confidential and proprietary information.  Competitors with knowledge of Accenture's strategies and solutions can effectively copy and duplicate those strategies and solutions, or improve their own services to be more competitive with Accenture—all without expending the substantial time and resources that Accenture incurred in developing those strategies and solutions in the first instance.  Accenture's insights and knowledge of non-public information that is both industry-specific and client-specific are among its most highly valued proprietary information and play a key role in helping Accenture sustain its competitive advantage over other competitors, such as BCG, that operate in the same space.

---

[2] The Midwest region is comprised of Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota and Wisconsin.

**II.** **Moore's Employment at Accenture**

    **A.** **Promotion to Managing Director and Leader of Accenture's Finance & Risk Services Practice for the Midwest**

16.    From 1996 to 2000, Moore worked for Accenture as a Senior Manager.  She later returned to Accenture in October 2015 as a Senior Manager in the F&R practice.  On December 1, 2017, Accenture promoted Moore to Managing Director in the same F&R practice, a role in which she served until her August 2, 2019 departure.  Moore also served as the Leader of Accenture's F&R practice in the Midwest region.

17.    Upon Moore's promotion to Managing Director, she served in a senior executive role within the Company.  Prior to her abrupt resignation, Moore led multiple teams of analysts, consultants, managers, and senior managers at any given time, directly engaged with numerous clients in the Midwest region, spoke on behalf of Accenture at industry events and in pitches to insurance and other financial services firms, and had approximately 35 people reporting to her at any given time.

    **B.** **The Confidential Information of Accenture Which Moore Acquired Related to Strategies and Solutions in the Financial Services and Cybersecurity in the Midwest Region**

18.    As Leader of Accenture's F&R practice for the Midwest, Moore focused on developing and implementing strategies and solutions for insurance companies and financial firms to address the needs of CFOs and CROs. Within the risk domain, Moore had a particular focus on receivables optimization, fraud and cybersecurity.  Accenture devotes substantial time, resources and investment to develop proprietary strategies and solutions that it can market and implement for its clients.  It is these proprietary strategies and solutions that provide Accenture with a competitive advantage vis-à-vis its competitors in the market, like BCG.

19.     Through her employment, Moore was given in-depth access to, and helped to develop, significant proprietary strategies and solutions for insurance and other financial services firms.  Accenture's proprietary strategies and solutions, including those that Moore helped develop and had access to, required the expenditure of substantial time, money and resources to develop.

20.     Just within the past year, for example, Moore led a cross-disciplinary team in the development of a unique and highly-confidential strategy to analyze and solve issues with a client's receivables and cash flow ("Project A").  Throughout the course of Project A, Moore worked closely in advising the client's C-suite on the strategies, and implementation of those strategies, that were highly successful for the client.

21.     Project A drew upon Accenture's resources and technologies across Accenture's organization, as well as Moore's area of practice in financial services and insurance.  Project A was a substantial effort by Accenture, which lasted over a year and involved multiple Accenture team members based in several different offices.  Project A was so innovative and successful that it won an award within Accenture for client excellence.

22.     The proprietary solutions Accenture developed in Project A are unique in the financial services marketplace.  Accenture has begun actively marketing the strategies and solutions developed in Project A to both clients and prospective clients in insurance and other financial services generally.

23.     Second, as part of her work for Accenture, Moore developed a significant practice in cybersecurity strategy and consulting, particularly with insurance-industry clients.  Moore was able to develop her expertise through Accenture's significant training, resources, and assistance, including, for example, access to Accenture's cyber security technical experts.

24.     With Accenture's support, Moore then lead Accenture's team in the development of an exceptionally confidential, proprietary cybersecurity strategy and solution ("Project B").  The Accenture team led by Moore was cross-disciplinary and included Accenture consultants with various expertise, including technical cybersecurity experts from Accenture's security group, and other consultants from the security, digital, and insurance groups.

25.     The proprietary strategies and solutions developed by Moore's team were so critical and high value that Moore regularly interfaced with the highest levels of the client's organization, including representing Accenture in client board meetings regarding Project B.

26.     Like Project A, Project B is a cutting edge strategy and solution that Accenture is marketing to clients, and that gives Accenture a competitive advantage in the marketplace.

27.     Cybersecurity is a fast growing area of strategy and consulting. Accenture has devoted substantial resources to the development of its cyber security capabilities through several significant acquisitions, substantial and costly investments in technologies, and training and education for its high potential talent, like Moore.

28.     BCG operates in the same consulting space as Accenture, and specifically markets its strategies in fraud, risk and cyber security.  Moore herself is working for BCG in its financial services group, and informed Accenture that she would be specifically focused on the insurance industry – just like she had at Accenture.

29.     Given her extensive knowledge of Accenture's highly confidential strategies and solutions in the very same area—including those developed in Project A and Project B—Moore inevitably will rely upon her knowledge of Accenture's strategies in her work for BCG.

C.     **Moore Acquired Accenture's Confidential Business and Client Information Strategies for the Next Three to Five Years Across Several Industries and Markets**

30.     In addition to her role as Leader of the F&R practice for the Midwest, Moore also served on Accenture's F&R national leadership team and the Midwest leadership team of Accenture's broader Financial Services group.  The F&R national leadership team consists of only nine (9) senior executives in the F&R practice out of the more than 300 consultants in the F&R practice in North America.

31.     Moore and other members of the leadership teams are provided detailed and highly-confidential information concerning Accenture's business, including its clients, prospects, strategies and pipelines.

32.     For example, on July 8, 2019—just three (3) weeks before Moore submitted her resignation—Moore received a detailed report in advance of the Financial Services Midwest leadership meeting.  The cover email to the report, which was sent only to senior leaders in Financial Services group, cautioned "Highly Confidential. Not To Be Distributed Further Without Authorization of the Sender."

33.     The cautionary note was necessary because the report contained, among other highly-confidential information, (i) detailed data on the sales and revenue performance and forecasts for fiscal year 2019 for the region, (ii) financial forecasts and strategies for fiscal year 2020,[3] (iii) client-level sales and revenue projections, (iv) client and prospect opportunities (by client name and specific revenue opportunity) for both the remainder of fiscal 2019 and for fiscal 2020, and (v) more than 50 specific key actions for Accenture to take with respect to dozens of clients to increase sales and revenue opportunities.

---

[3] Accenture's fiscal year 2020 runs from September 1, 2019 to August 31, 2020.

34.     Moore regularly received reports containing this type of detailed, highly-confidential business information.  A competitor with knowledge of the information contained in these reports received by Moore would have Accenture's playbook on client and prospect development, where it was meeting its financial goal and where it was falling short, and, therefore, the areas in which Accenture was going to focus for more than the next year.  With such information, a competitor such as BCG could better anticipate, and make plans to counteract, Accenture's moves in the market and with particular key clients.

III.    **Moore's Employment Agreement with Accenture**

35.     As a condition of Moore's promotion to Managing Director, she entered into the operative Employment Agreement with Accenture on December 1, 2017, as discussed above.  *See* Ex. 1.

36.     Moore's starting base salary as a Managing Director was approaching $300,000.  Moore also became eligible for higher bonus and equity awards.  For example, on December 1, 2017, Moore received an annual lump sum bonus of over $48,000.  In 2018, she received another annual bonus of over $93,000.  Moore received further significant compensation in the months immediately prior to her abrupt resignation.  In early 2019, Moore received another significant base salary increase.  On April 30, 2019, Moore also received a $75,000 retention bonus from Accenture (subject to certain vesting conditions), and on May 1, 2019, Moore received an additional $150,000 retention equity award of restricted share units (again subject to certain vesting conditions.

37.     In order to be eligible for her promotion and greatly enhanced compensation, Moore agreed to the Restrictive Covenant Agreement (the "RCA") that is Exhibit B to her Employment Agreement.  *Id.* at 20.  The RCA sets out several restrictive covenants that Moore agreed to abide

by as a condition of her employment at Accenture, including non-competition, non-disclosure (or confidentiality), non-solicitation, and non-poaching restrictions.  *Id.* at 23-24.

38.     The non-competition restriction (the "Non-Compete Restriction") set out in § 1(b) of the RCA narrowly restricts Moore only from working for one of Accenture's competitors for one year following the termination of her employment (i) in the same "Territory" Moore worked for Accenture (here, the Midwest Region), (ii) where Moore would perform the same or similar services to those she performed at Accenture.  Specifically, the Non-Compete Restriction provides that Moore:

> "shall not … associate" with any "Competitive Enterprise in the Territory in any capacity which involves the performance of services that are the same as or similar to those you performed for Accenture … within the eighteen (18) months prior to the date on which your employment with Accenture terminated."

*Id.* at 23.

39.     A "Competitive Enterprise" is defined as any business that performs services that Accenture also offers or any business listed on Accenture's internal list of competitors. Specifically, a "Competitive Enterprise" is any business that "engages in … the performance of services of the type conducted, authorized, offered or provided by Accenture," and includes, "without limitation, the entities set forth on Accenture's current list of Accenture's competitors." *Id.* at 21 at § 1(a).  BCG has been and is expressly listed on Accenture's intranet as one of Accenture's competitors, and thus, a "Competitive Enterprise" as defined in the Employment Agreement.

40.     The "Territory" is defined as the territory(s) in which Moore worked or "in respect of which [Moore was] involved in providing services to" during the 12 months preceding her

departure from Accenture.  *Id.* at 22 at § 1(a).  Moore's "Territory" at Accenture was the Midwest region, comprised of under the Employment Agreement is the Midwest region.

41.     Moore also agreed to non-disclosure restrictions (the "Confidentiality Restriction") in the RCA.  *See* Ex. 1 at 23.  Under the Confidentiality Restriction, Moore is prohibited from disclosing Accenture's confidential information or trade secrets "at any time" until such time as that information no longer constitutes confidential or trade secret information, as defined in the Employment Agreement.  Moore:

> "shall not … either directly or indirectly, use, … give, … show, divulge, disclose, reveal, share, … appropriate, or otherwise communicate any Confidential Information or Trade Secrets at any time"

after her departure from Accenture.  *Id.*

42.     "Confidential Information" is defined in the Employment Agreement as, among other information:

> (a) [L]ists and databases of Accenture's … clients …; (b) lists and databases of prospective clients …; (c) confidential details of Accenture's … clients' products and services; (d) ***commercial or technical information of Accenture*** …; (e) ***financial information and plans of Accenture*** …; (f) prices/pricing structures/hourly rates of Accenture ..., including any discounts …; … (i) terms of Accenture's … business with clients …; (j) lists and databases of Accenture's … employees, officers …; … (l) ***object or source codes and computer software and applications***; … (i) ***intellectual property rights*** …; and (t) ***details or descriptions of any work Accenture … has or will perform for any specific client***.

*Id.* at 21-22 at § 1(a)(4) (emphasis added).

43.     "Trade Secrets" is defined in Moore's Employment Agreement as including, among other information:

> [I]nformation relating to Accenture … and their respective clients [or] prospective clients …, that is protectable as a trade secret under applicable law, including, without limitation, … ***technical or non-technical data, a formula, … a program, a device, a method, a technique, … a process, financial data, financial plans, business and strategic plans, product***

> **plans, source code, object code, software, applications, ... or a list of actual or potential customers** ... and which information (a) derives economic value, actual or potential, from not being generally known ... and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Id.* at 23 at § 1(a)(9) (emphasis added).

44.    Moore's work for BCG, upon information and belief, (i) involves consulting in the same financial services and insurance space in which she had performed work for Accenture, and (ii) in the same territory in which she had performed that work for Accenture.  Moore's employment at BCG, therefore, breaches the Non-Compete Restriction and, through her work, Moore either has, or inevitably will, use Accenture's Confidential Information and Trade Secrets in violation of the Confidentiality Restriction.

45.    In addition to the Non-Compete and Confidential Restrictions, Moore's non-solicitation restriction (the "Non-Solicit Restriction") set out in § 1(c) of the RCA prohibits her from:

> [D]irectly or indirectly (1) solicit, or assist any other individual, person, firm or other entity in soliciting, any Restricted Client or actively sought Prospective Restricted Client for the purpose of performing or providing any Relevant Services within the Territory; or (2) perform or provide, or assist any other individual, person, firm or other entity in performing or providing, Relevant Services for any Restricted Client or actively sought Prospective Restricted Client within the Territory ....; or (3) interfere with or damage, or attempt to interfere with or damage, any relationship and/or agreement between Accenture ... and a Restricted Client, actively sought Prospective Restricted Client, or any other client, potential client or service provider with whom Accenture ... does business.

*Id.* at 23.

46.    The RCA contains a similar provision prohibiting Moore from soliciting any of Accenture's employees during the 12-month period following her employment with Accenture. Under the non-poaching restriction (the "Non-Poaching Restriction") set forth in § 1(d), Moore "shall not," for that 12-month period:

> [D]irectly or indirectly, solicit, employ or retain, or assist any other individual, person, firm or other entity in soliciting, employing or retaining, any employee or other agent of Accenture …, (1) with whom [Moore] had material dealings; (2) from whom, or as a result of contact with whom, [Moore] ha[s] obtained Confidential Information or Trade Secrets; or (3) whom [Moore] ha[s] supervised on a client or prospective client engagement, in the twenty-four months preceding the termination of [her] employment.

*Id.* at 23.[4]

## IV.   Moore's Abrupt Resignation from Accenture

47.     Moore abruptly delivered her resignation notice by email on Monday, July 29, 2019.  In her resignation email, Moore stated that she had accepted a position at BCG, but falsely assured Accenture that she "did not believe" she would be competing with Accenture in her new role.  She did not provide written details about her new role at BCG.

48.     Moore subsequently represented that she would be working in the *insurance* group at BCG.  Accenture has since learned, however, that Moore is actually working in the *Financial Services* group at BCG—the same group in which she worked at Accenture.

## V.    Moore Joins BCG in Violation of Her RCA

49.     Like Accenture, BCG is a global management consulting firm.  BCG works with its clients to "transform their mindsets and our own, reimagining businesses and meeting the competitive challenges of the future."[5]  BCG aims to help its clients with a "total transformation— driving complex change, enabling organizations to grow, building competitive advantage, and

---

[4] In discussions with Moore following her resignation, Moore appeared to acknowledge her Non-Solicit and Non-Poaching Restrictions.  However, Moore's acknowledgement came as part of a broader discussion about Moore's overall restrictions and the parties have not reached any agreement as a result of those discussions.  As such, while Accenture does not presently plead a breach of these restrictions, they are properly included in the Order to Show Cause proposed by Accenture in its request for preliminary injunctive relief.

[5] BCG, "Beyond Consulting: A Partner in Transformation," available at https://www.bcg.com/en-us/about/mission/approach.aspx (last accessed Aug. 18, 2019).

driving bottom-line impact."[6]   BCG operates across multiple industries and geographic regions and, similar to Accenture, aims to customize solutions to each client.

50.     BCG's business model is a consulting model.   BCG's consultants work within several BCG groups that each focus on providing a specific set of services to BCG's clients.

51.     BCG is a direct competitor of Accenture in the Midwest region and across North America in the financial services space.   The two companies compete both overall and specifically for financial services and insurance clients.

52.     BCG specifically touts and markets on its website and elsewhere its financial services and cybersecurity capabilities—two fields in which Moore specialized at Accenture.

53.     BCG is expressly listed as one of Accenture's competitors on Accenture's intranet page (to which Moore had access).   Companies on that internal Accenture list are classified as "Competitive Enterprise[s]" under the Employment Agreement for purposes of the Non-Compete Restriction.

54.     Upon information and belief, Moore began working for BCG on Monday, August 12, 2019.   Moore is a Partner and Managing Director in BCG's Financial Services group.   Based upon the similarities between BCG's and Accenture's consulting operations, Accenture has good reason to believe that Moore's work focuses on the same financial services and insurance industries for which she was responsible at Accenture.   Just as she worked in the F&R practice at Accenture, Moore has begun working in the analogous Financial Services group at BCG. Moreover, Moore continues to be based in Chicago and, upon information and belief, services or will service the Midwest for BCG.

---

[6] BCG, "About Us," available at https://www.bcg.com/en-us/about/about-bcg/overview.aspx (last accessed Aug. 18, 2019).

55.     It is almost a certainty that Moore's job responsibilities and services at BCG are also the same or similar to those that she performed at Accenture.  In fact, Moore has had ample opportunity to clarify her role at BCG through discussions concerning her restrictions following her departure, but Moore has not done so.

56.     Moore breached the Non-Compete Restriction and inevitably will breach the Confidentiality Restrictions in her Employment Agreement in her work for BCG, one of Accenture's competitors, by (i) consulting in the same financial service space in which she had performed work for Accenture and (ii) in the same territory in which she had performed work for Accenture namely in the Midwest region.

57.     Given the substantial overlap in her prior work at Accenture and her work for BCG, Moore simply cannot avoid using and relying upon Accenture's Confidential Information and Trade Secrets her work for BCG. Moore's inevitable use of Accenture's Confidential Information and Trade Secrets would constitute a breach of the Confidentiality Restriction in her Employment Agreement, and threatens Accenture with imminent and irreparable harm.

## VI.     Accenture Will Be Irreparably Harmed by Moore's Conduct

58.     Moore's inevitable use and disclosure of Accenture's Confidential Information and Trade Secrets in her work for BCG would result in substantial and irreparable harm to Accenture. Accenture has invested millions of dollars and years of research, personnel, financial resources, and other commitments to developing its competitive edge in the financial services sector in the Midwest.  Moore's use of Accenture's Confidential Information and Trade Secrets in her work for BCG would unfairly reduce Accenture competitive advantage in the market, through the improper competitive advantage BCG will realize through Moore's wrongful conduct.

59.     Moore's imminent or actual violation of the Non-Compete Restriction would similarly result in substantial and irreparable harm to Accenture.

60.     As Moore herself has expressly conceded, Accenture would not possess an adequate remedy at law for her breach of the Non-Compete and Confidentiality Restrictions in the Employment Agreement.  *See* Ex. 1 at 24.  Moore "acknowledge[d] and agree[d] that Accenture's … remedy at law for any breach of the covenants contained [in the Restrictive Covenant Agreement] would be inadequate."  *Id.*  She "agree[d] that proof shall not be required that … remedies at law would be inadequate."  *Id.*

61.     Importantly, Moore "acknowledge[d] and agree[d] … that ***for any breach of such covenants, Accenture … shall***, in addition to other remedies as may be available to it at law or in equity, or as provided for in this Restrictive Covenant Agreement, ***be entitled to an injunction*** …, restraining [Moore] from committing or continuing to commit any violation of the covenants."  *Id.* (emphasis added).  Moore's contractual admission is binding.

## VII.   Accenture Satisfies All Other Elements for Issuance of a Preliminary Injunction

62.     Accenture is more than likely to prevail on the merits in arbitration, establishing that Moore has breached and will imminently breach the restrictive covenants in the Employment Agreement.  Moore has no viable defense for such breached, given that she is or soon will be performing the same or similar services for BCG within the same market.

63.     The balance of the equities tips decidedly in support of a preliminary injunction against Moore and in Accenture's favor.

64.     Given that Moore would not be prohibited from working at BCG on projects *not* subject to the scope of the Non-Compete Restriction—such as (i) projects outside of the Midwest or (ii) non-financial projects within the Midwest—Moore would not be significantly harmed

18

through the imposition of a preliminary injunction.  By contrast, once she discloses Accenture's confidential information to BCG, Accenture could permanently lose its Confidential Information and Trade Secrets to BCG and thereby lose its competitive advantage on the market.

65.     The effect of the preliminary injunction on Moore would have no effect on the public interest.

66.     A preliminary injunction is warranted given the factors discussed above.  Granting the requested preliminary injunction will further ensure that any arbitration award that Accenture may subsequently obtain against Moore will not be rendered ineffectual without such provisional relief.

**COUNT I:**
**Preliminary Injunction**
**Based On Breach and Threatened Breach of Employment Agreement**

67.     Accenture incorporates each and every allegation above as if set forth fully herein.

68.     Moore's improper and unlawful breaches of contract, either imminent or ongoing, threaten to continue to cause and will cause further immediate and irreparable injury to Accenture's business, goodwill, client relationships, and standing in the industry.

69.     Such injuries are substantial and cannot be adequately remedied through monetary relief.

70.     Injunctive relief is needed pending arbitration of this dispute in order to preserve the value of Accenture's business assets and trade secrets that are at risk of disclosure due to Moore's conduct.

71.     Unless injunctive relief is granted, Accenture will continue to suffer immediate and irreparable harm.

72.     Accenture lacks an adequate remedy at law to address this substantial and irreparable harm that it is incurring as a result of Moore's actions.

## **PRAYER FOR RELIEF**

73.     The Employment Agreement's dispute resolution provision is enforceable by this Court pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, which authorizes this Court to enter an Order directing that arbitration proceed in the manner provided for in the Employment Agreement.  *See* 9 U.S.C. § 4; Ex. 1 at 9, 25.

74.     Ancillary to its power under the Federal Arbitration Act to compel arbitration, this Court is empowered to issue preliminary injunctive relief to preserve the meaningfulness of arbitration by preventing a party from irreversibly altering the status quo.

75.     This Court is further authorized to grant such injunctive relief pending arbitration in aid of its jurisdiction pursuant to 28 U.S.C. § 1651.

WHEREFORE, Petitioner, Accenture LLP, respectfully requests the Court to enter a preliminary injunction against Respondent, Nadine Moore, pursuant to Rule 65 of the Federal Rules of Civil Procedure by issuing an Order:

A.     Enjoining Moore, until further order by an Arbitrator convened in connection with an arbitration pursuant to Moore's Employment Agreement between the parties to this action, or through August 2, 2020, whichever is sooner, from associating with a business enterprise that engages in, or owns or controls a significant interest in any entity that engages in, the performance of services of the type conducted, authorized, offered or provided by Accenture or any of its affiliates in Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota and Wisconsin in any capacity which involves the performance of services that are the same as or similar to those Moore performed

for Accenture within the eighteen (18) months prior to the date on which her employment with Accenture terminated;

B.   Enjoining Moore, and any person or entity acting in concert with her or under her supervision, until further order by an Arbitrator convened in connection with an arbitration pursuant to Moore's Employment Agreement between the parties to this action, or through August 2, 2020, whichever is sooner, from soliciting or servicing, or inducing not to place business with Accenture, any person, firm, corporation or other organization whatsoever to whom Moore directly or indirectly performed or assisted in performing any services of the type provided by Accenture, its affiliates at any time past, present or future, including, without limitation, consulting services, technology services, and/or outsourcing services, or with which Moore otherwise had material contact or about which Moore learned of confidential information or trade secrets during the last twelve (12) months of her employment;

C.   Enjoining Moore, and any person or entity acting in concert with her or under her supervision, until further order by an Arbitrator convened in connection with an arbitration pursuant to Moore's Employment Agreement between the parties to this action, or through August 2, 2020, whichever is sooner, from soliciting or servicing, or inducing not to place business with Accenture, any person, firm or corporation, or other organization whatsoever with whom Moore had any negotiations or discussions, or were otherwise involved, regarding the possible performance of services by Accenture or any of its affiliates during the last twelve (12) months of her employment;

D.   Enjoining Moore, and any person or entity acting in concert with her or under her

supervision, until further order by an Arbitrator convened in connection with an arbitration pursuant to Moore's Employment Agreement between the parties to this action, or through August 2, 2020, whichever is sooner,  from soliciting or endeavoring to cause Accenture employees with whom she came into contact for business purposes or about whom she obtained confidential information to leave employment with Accenture;

E.   Enjoining Moore, and any person or entity acting in concert with her or under her supervision, from using, disclosing or disseminating Accenture's confidential information in violation of Moore's Employment Agreement with Accenture; and

F.   Expediting discovery;

G.   Granting Accenture its costs and disbursement incurred in connection with this litigation together with such other further relief as the Court may deem just and proper.

Dated:  August 22, 2019

Respectfully submitted,

By:  s/ Seth E. Spitzer

Seth E. Spitzer
Lisa C. Chan
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
sspitzer@winston.com
lchan@winston.com

Shane W. Blackstone
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601

Tel: (312) 558-5600
Fax: (312) 558-5700
sblackstone@winston.com

*Counsel for Petitioner Accenture LLP*